UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

UMEME RAYSOR,

                Petitioner

    v.                                            03 Cv 5418 (SLT) (JMA)

UNITED STATES,

                Respondent
---------------------------------------------------------------X

## POST-HEARING MEMORANDUM ON BEHALF OF
## PETITIONER UMEME RAYSOR

JOYCE C. LONDON, P.C.
20 Vesey Street, Suite 400
New York, New York 10007
(212) 964-3700

*ATTORNEY FOR PETITIONER*
*UMEME RAYSOR*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UMEME RAYSOR,

        Petitioner

  v.                                     03 Cv 5418 (SLT) (JMA)

UNITED STATES,

        Respondent
------------------------------------------------------------X

**POST-HEARING MEMORANDUM ON BEHALF OF
PETITIONER UMEME RAYSOR**

    This Post-Hearing Memorandum of Law is respectfully submitted on behalf of Petitioner/Defendant Umeme Raysor.

**I.**    **INTRODUCTION**

    Mr. Umeme Raysor, (hereinafter Petitioner), was charged in Indictment S2 96 Cr 339 (EHN) with participating in a violent street gang which distributed large quantities of drugs in New York and Virginia.   The multiple counts with which Petitioner was charged included participating in a racketeering enterprise, where the various racketeering acts included seven murders and conspiracies to murder and a narcotics conspiracy (Count One); participating in a racketeering conspiracy (Count Two); substantive counts of murder (Counts Three - Seven); using and carrying a firearm in furtherance of a crime of violence (Count Eight); assault in aid of racketeering (Count Fifteen); operating a continuing criminal enterprise (Count Eighteen) ; conspiracy to distribute and possess with intent to distribute cocaine base (Count Nineteen); and

a substantive count of distribution of cocaine base (Count Twenty-Two).

On December 10, 1996, the government sent to all remaining defense counsel in the case, including Petitioner's counsel, Michael Hurwitz, Esq. a letter memorializing a global plea offer for these defendants.   According to the plea offer, an offer pursuant to then Rule 11(e)(1)© of the Federal Rules of Criminal Procedure, Petitioner would be required to plead guilty to a murder in aid of racketeering and would face a determinate sentence of twenty-nine (29) years. The plea offer would expire on December 20, 1996.  However, the offer was then extended for a few weeks until after a meeting between Petitioner's original counsel, and the government scheduled for February 3, 1997.   The plea offer was rejected and no additional plea offers were made.

About three weeks later, on February 27, 1997, the government moved to disqualify original counsel on the basis of an actual conflict of interest resulting from original counsel's prior representation of two co-defendants.  One of these co-defendants, Ronald Stanley had also rejected his plea offer and was preparing for trial.  The other co-defendant, Shawn Davis, had pled guilty pursuant to a cooperation agreement with the government while the global plea offer was pending.  Thus, a serious conflict existed from the inception of the case and continued throughout the period of plea negotiations.  However, it was not brought to the court's attention until after the expiration of the plea offer.

 After a twelve-week trial, petitioner was convicted on four counts: (I) racketeering in violation of 18 U.S.C. § 1962©; (ii) racketeering conspiracy in violation of 18 U.S.C. § 1962(d); (iii) operating a continuing criminal enterprise in violation of 21 U.S.C. § 848; and iv) conspiracy to distribute and to possess with intent to distribute cocaine base in violation of 21

3

U.S.C. §§ 846 and 841(b)(1)(A). Petitioner was acquitted on eight counts. On August 13, 1999, petitioner was sentenced to multiple life sentences.

Petitioner's conviction for conspiracy to distribute narcotics was vacated on direct appeal, but the district court's judgment in other respects was affirmed. United States v. Raysor, No. 99-1503, 2001 WL 36037731 (2d Cir. Apr. 29, 2002). On November 4, 2002, the Supreme Court denied appellant's petition for a writ of certiorari. Raysor v. United States, 537 U.S. 1012 (2002).

On October 20, 2003, Petitioner filed a *pro se* petition pursuant to 28 U.S.C. § 2255 asserting *inter alia* that he had been denied effective assistance of counsel because his original counsel "failed to discuss with him the advisability of whether to accept or reject the government's plea offer. Judge Townes concluded that Petitioner failed to establish that he was actually prejudiced by counsel's ineffectiveness and denied the motion without holding a full evidentiary hearing. Petitioner appealed this decision. The Second Circuit vacated the ruling and remanded for an evidentiary hearing. This evidentiary hearing was held on December 6, 2012, before Magistrate Judge Azrack.

## II.    THE EVIDENTIARY HEARING

At the hearing, the government called two witnesses, Petitioner's original attorney, Michael Hurwitz and former Assistant United States Attorney Margaret Giordano who was the prosecutor during the relevant time period of the plea offer. Two witnesses testified on behalf of Petitioner, Umeme Raysor and his sister Pampata Raysor.

### 1.    Testimony of Attorney Michael Hurwitz

Michael Hurwitz, ("Hurwitz"), a partner in the law firm of Hurwitz, Stampur and Roth,

4

testified that he has practiced criminal law for the past forty years.  He was the original counsel

for Petitioner in the underlying criminal case.  Notwithstanding aspects of this case which would

tend to make it memorable even in the context of a forty-year history of criminal law, see infra,

Section III (2), Hurwitz has minimal specific recollection of the conduct of the case.  To start, he

did not remember whether he was retained or assigned to represent Petitioner.[1]

     With respect to how the plea offer was conveyed to Petitioner and the actual discussions,

if any, Hurwitz had with Petitioner, Hurwitz had no recollection.  He assumes that he gave

Petitioner a copy of every single piece of paper dealing with this case, but has no recollection of

giving him the plea offer letter.  T at 28.[2]  Additionally, he does not recall either informing

Petitioner that there was a deadline on the offer or how long he spent discussing the offer with

Petitioner.  T. at 28.  However, he testified that in keeping with his general practices, he would

have discussed the evidence with Petitioner and talked about cooperators but that he had no

information about the cooperators from the government.  T at 9. He further testified that he

probably would have told Petitioner that the strength of the case would depend in large part or at

least to some extent on the strength of cooperators, the quality and number of cooperators.  T at

9.  He then testified that he did not tell Petitioner to reject the plea offer.  T at 10.  Conversely, he

---

[1]     Docket Entry No. 43 of the underlying case indicates that Hurwitz was assigned
pursuant to the Criminal Justice Act upon Raysor's arrest.  See United States v. Raysor, 96 Cr
339 (EHN), Docket Entry No. 43.  However, there is no subsequent docket entry that a CJA
voucher for payment was filed after Hurwitz was terminated.  Moreover, the testimony of
Petitioner, Petitioner's sister and documents filed by the government in support of its motion
seeking to disqualify Hurwitz from representing Petitioner on the grounds of actual conflict of
interest are unequivocal that the law firm of Hurwitz, Stampur and Roth was retained to
represent Petitioner.

[2]     "T" at # refers to the page number of the Evidentiary Hearing transcript.

did not recommend that Petitioner accept the plea offer.  Finally, he detailed his customary

practice regarding the handling plea offers depending on whether he believes that the

government has a strong case, and or a case which is more triable.  T at 10-11. Significantly, he

did not categorize this case as either a strong case for the government or a triable case.

      2.    **The Testimony of Petitioner Umeme Raysor**

Petitioner testified that after his arrest, he was initially detained for a very brief period at

the Metropolitan Detention Center in Brooklyn but was then transferred to the Federal

Correctional Institution at Otisville, NY where he was visited twice by attorney Hurwitz.  T at

70.  Petitioner recalled that his discussions with Hurwitz in Otisville primarily concerned

Hurwitz' urging him to cooperate with the government.  T at 76.    Outside of these two visits,

communications between Petitioner and Hurwitz were by telephone.  Petitioner recalled that he

spoke to Hurwitz by phone about once a week and the phone calls lasted only three to four

minutes.   T at 71.  Petitioner further testified that there came a time when he had an argument

with Hurwitz on the telephone and they stopped communicating for a period of time.  During one

of their phone calls, Petitioner  became upset with Hurwitz because Hurwitz was using

profanity-laced language and cursed at Petitioner  over the phone when Petitioner objected to the

profanity.  As a result of this argument, communications between Petitioner and Hurwitz were

curtailed.  T at 72.

Petitioner testified that he first learned of the global plea offer through his co-defendants

and then subsequently through Hurwitz by telephone while Petitioner was in pre-trial detention

in Otisville.  T at 74.  He recalls that he was told the numbers on the phone and he asked

Hurwitz, "Can we do better?"  T at 75.  He testified that in response to his request to see the

offer in writing, Hurwitz sent him a list of names and the amount of time offered to each of the

co-defendants.  T at 76.  He does not believe that he ever saw the government's 12/10/96 plea

offer letter.  T at 77.  He further testified that Hurwitz did not visit with him in Otisville to

discuss this plea and he did not recall any discussion with Hurwitz about which specific count he

would have to plead guilty to.  T at 77.  He also testified that he did not recall having a

discussion with Hurwitz regarding the elements of each count of the indictment and the sentence

that he would face if convicted of each specific count.  T at 78.  He testified that during the time

of the plea offer, he was not aware that a conviction on almost any count of the indictment would

cause him to receive a life sentence.  T at 79.  Nor did he recall Hurwitz calculating for him how

much time he would serve on a twenty-nine year sentence if he got "good time" credit and was

halfway house eligible towards the end of his term of imprisonment.  T at 80.

       Petitioner testified that there never came a time when he explicitly informed Hurwitz that

he did not want to accept the plea offer and that he wanted to go to trial.  Rather he believed that

the deadline had run so the plea offer was no longer available to him and then the government

moved to disqualify Hurwitz from representing him.  T. at 81.  He also testified that Hurwitz was

never present at the co-counsel/co-defendant meetings which were held to discuss the global plea

offers.  T at 80.  Finally, he testified that Hurwitz never gave him Hurwitz' professional opinion

as to whether he should accept the plea offer or not, T at 81, and that had he been properly

advised by counsel, he would have accepted the plea offer instead of proceeding to trial.

**3**.     **The Testimony of Pampata Raysor**

       Pampata Raysor, Petitioner's sister, was in her twenties and living in Brooklyn when

petitioner's case was pending.  She and her mother met with an attorney from the law firm of

Hurwitz, Stampur and Roth to retain him to represent her brother. She was present at most, if not all court appearances. On each occasion she asked Hurwitz about the case but never got a direct answer from him. Hurwitz never informed her that Petitioner had a plea offer of twenty-nine years, or discussed with her the advisability of her brother pleading guilty or proceeding to trial.

During the pendency of the case, she regularly visited her brother in custody, including when he was housed at the Federal Correctional Institution in Otisville. Additionally, she and her brother spoke regularly on the telephone. In th conversations with her brother, he was unsure of what was going on with his case so she tried, unsuccessfully, to talk to Hurwitz about the case. Specifically, she testified, Petitioner was trying to ascertain "whether or not going to trial would be a good idea, because he just didn't know. He didn't discuss anything with the lawyer, because the lawyer somehow wasn't available to talk to him." T at 115. As a result, Petitioner was complaining to her that he was not getting enough information from his lawyer. Notwithstanding that she kept asking Hurwitz about her brother's case, he never informed her of the life sentences her brother faced if convicted on almost every count with which he was charged. In response to a question from the Court, Ms Raysor testified that she asked Hurwitz if going to trial was a good idea, but similarly could not obtain a direct answer from him.

**4.**  **The Testimony of Former Assistant United States Attorney Margaret Giordano**

Ms. Margaret Giordano testified that she was an Assistant United States Attorney in the office of the United States Attorney for the Eastern District from 1991 to 2005 and that she was the prosecutor who investigated the Raysor case. On December 10, 1996, she sent a letter detailing a global plea offer to the remaining defendants in the case. See Hearing Exhibit 2. For

the offer to be valid, it had to be accepted by all the defendants and it contained an expiration deadline of December 20, 1996.  Id.  The deadline, however was extended in light of ongoing plea discussions.  T at 55.   She recalled that Petitioner's offer required him to plead guilty to a racketeering charge that involved at least one murder and receive a determinate sentence of twenty-nine years.  T at 44.   She testified that Hurwitz' response on behalf of Petitioner was similar to the responses of his co-counsel, namely that Petitioner was potentially interested but wanted better numbers.  Tat 45.

Although the Government's 12/10/96 letter stated that the offers were global with respect to all defendants except defendants Gus Robinson and Cleveland Whorley, two of the "global" co-defendants, Shawn Davis and Michael Jones, became exceptions to the Government's stated position.  Davis signed a cooperation agreement on January 16, 1997[3] and pled guilty to Counts Three, Six and Seven of the Superseding Indictment charging him with murder and conspiracy to murder in aid of racketeering.   She testified that his cooperation agreement served to distinguish him from the other co-defendants named in the global offer. Tat 53.  Ms Giordano testified that she also carved out an exception to the global plea offer for Michael Jones permitting him to accept the offer as set forth in the global plea letter of December 10, 1996 even though the other defendants had not accepted their offers.  Ms Giordano believed that his "carve out" was made close to trial because the evidence against Jones had changed significantly and the prosecutors wanted him to plead in order to ensure a conviction.  She testified that she believes he pled guilty after the global plea offer had expired. T at 54.

---

[3]        At the time Davis' signed his cooperation agreement, the global plea offers were still open.

9

III.     **ARGUMENT**

1.     **Hurwitz' Performance With Respect to the Plea Offer Fell Below the Objective Standard of Reasonableness**

Petitioner has alleged in his 2255 Petition that Hurwitz failed to advise him whether he should accept or reject the plea offer.

It is the well-established law of this Circuit that failure to advise a client as to a plea offer is unreasonable performance. Cullen v. United States, 194 F.3d, 401, 404 (2d Cir. 1999). The record is clear that Hurwitz did advise Petitioner of the plea offer. See T at 7. The law, however, requires more. It is also the well-established law of this Circuit that failure to give any advice concerning the acceptance of a plea bargain falls below the standard of reasonable representation. Id citing Boria v. Keene, 99 F.3d 492, 496-497 (2d Cir. 1996).

Hurwitz' testimony contains no direct statements that such advice concerning whether to accept the plea offer was given to Petitioner. Rather, he equivocated regarding the advice he gave to Petitioner. With respect to the plea offer, he testified that over a period of time, he discussed the pros and cons of accepting the offer but does not remember any details of the conversation. T at 8. He testified that Petitioner was facing life on the one hand but that the offer requiring a sentence of twenty-nine (29) years was high on the other hand. If Petitioner pled guilty, he was going to jail for a very long time. If he went to trial, he knew he would face the possibility of a life sentence. T at 8. Thus, Hurwitz stopped short of providing the necessary and sought after professional advice Petitioner was seeking.

Hurwitz further testified that the determination of whether a case is a triable case or not obviously carries a subjective component to it. However, in a case such as this where a

10

conviction on almost any count in the indictment with which Petitioner is charged will carry with it either a statutory life sentence or a mandatory life sentence under the then mandatory Sentencing Guidelines, it is incumbent upon the defense attorney to "bring home" to the defendant the enormous risks associated with going to trial.  In this regard, Hurwitz testified on cross-examination that he has no recollection of the following:

-      whether he went through the indictment with Petitioner count by count, racketeering act by racketeering act;

-      whether he discussed with Petitioner that each murder count or racketeering act carried a mandatory life sentence;

-      whether he advised Petitioner that he got acquitted of six of the seven charged murders, he would still face a mandatory life sentence;[4]

-       discussing the sentencing guidelines with Petitioner;

-      writing Petitioner a letter detailing the sentence he would face on each count of conviction;

-      detailing how much time Petitioner would serve on a twenty-nine (29) year sentence after the Bureau of Prisons "good time" reduction;

-      whether he spoke to Petitioner's family members about the advisability of taking a plea; and

-      whether he asked one of his law partners to meet with Petitioner and encourage him to accept the plea offer.

T at 22-23; 29-30.

       Thus, it is apparent from Hurwitz' testimony that he did <u>not</u> actively encourage Petitioner to accept this plea offer in light of the draconian alternative of being convicted of any one of the

---

     [4]       He did however testify that he recalled telling Petitioner that he was faced with the possibility, depending on what he was convicted of, of going to jail for the rest of his life.  T at 23.  On further cross-examination, he now acknowledged that petitioner would get a mandatory life sentence on almost any count of conviction.  T at 24.

seven murders or operating a continuing criminal enterprise.

Petitioner's testimony reinforces this conclusion as Petitioner detailed the limited and tense communications between himself and Hurwitz by the time of the global plea offer.  In fact, Petitioner did not believe that he ever received an actual copy of the Government's 12/10/1996 letter, but rather received from Hurwitz a list of each co-defendant named in the global plea offer and the amount of time that each defendant was being offered and only received this list after asking Hurwitz by telephone from Otisville to provide him with a copy of the numbers for each defendant.  Petitioner recalled no explanation from Hurwitz as to how the Sentencing Guidelines would apply to each count of the indictment he was charged in.  Moreover, Petitioner was not aware at that time that a conviction on almost any count of the indictment would cause him to receive a mandatory life sentence.  He also testified that Hurwitz never discussed with him approximately how much time he would have to serve on a 29 year sentence.  Significantly, Petitioner testified that Hurwitz was not present at the joint co-defendant/co-counsel meetings convened specifically to discuss the global plea offers.  Finally and crucially, Hurwitz never gave Petitioner Hurwitz' professional opinion as to whether he should accept the offer or not.

The testimony of Pampata Raysor substantiates this fact.  When she herself asked Hurwitz for his opinion as to whether Petitioner should go to trial or plead guilty, she was unable to obtain a direct answer from him.  Similarly at the evidentiary hearing, Hurwitz, at no time, testified that he either recommended or counseled against accepting of the plea offer.  Rather, he merely spoke in generalities about strong cases and not so strong cases.  Notwithstanding that Petitioner was specifically asking Hurwitz for his professional opinion regarding the acceptance

of the plea offer, neither he nor his family was able to obtain a direct answer from Hurwitz[5].

Given the inevitability of a mandatory life sentence on almost any count of the indictment, reasonable legal advice, entails making absolutely sure that Petitioner understands unequivocally the dangers of proceeding to a federal trial on a multi-count indictment which includes allegations of seven murders in aid of racketeering and allegations under the drug kingpin statute.  Reasonable legal advice under these circumstances requires that Petitioner understands unequivocally that a conviction on almost any count will result in his mandatory lifetime incarceration.  Reasonable legal advice in a case such as this further requires that Petitioner understand unequivocally that a sentence of twenty-nine years with a 15% "good time" reduction together with halfway house eligibility would, result in a sentence of about 24 years, thus making Petitioner eligible for release at around age fifty (50).  Such crucial legal advice was not provided by Hurwitz to Petitioner.

Although former Assistant United States Attorney Margaret Giordano testified that the plea offer was a global plea offer and had to be accepted by all defendants, she also testified that two exceptions were made to this position.  Based upon these exceptions, it cannot be categorically asserted that even if Petitioner had accepted his plea offer, the government would not have considered it. The situation of Petitioner's brother, co-defendant Chaka Raysor supports this conclusion.  Chaka Raysor was a fugitive at the time the plea offers were pending.  He was considered by the government to be the leader of the enterprise and faced identical charges to Petitioner.   He was subsequently offered a seventeen-year plea offer pursuant to Rule 11(c)1)©

---

[5]        It should be noted that both Petitioner and his sister testified that the retainer agreement with Hurwitz stipulated an agreed-upon fee which included a trial fee.

of the Federal Rules of Criminal Procedure.

Accordingly, it is respectfully submitted that under the facts adduced at the evidentiary hearing, Hurwitz performance with respect to the professional advice provided to Petitioner, or lack thereof, fell below an objective standard of reasonableness.

2.    **Hurwitz Had a Serious Conflict of Interest**
      **During the Relevant Period of Plea Negotiations**

In both the Second Circuit's written opinion remanding this matter for an evidentiary hearing, and at the oral argument, the issue of original counsel's conflict of interest was raised *sua sponte* by Judges Winter, Calabresi and Katzmann, the panel of Judges hearing this matter. In his written opinion, Judge Winter wrote:

> The statement by original counsel, quoted supra, was only that he conveyed the plea offer but appellant rejected it.  This statement is hardly equal to the "detailed affidavit from trial counsel credibly describing the circumstances concerning appellant's failure to testify" that we found sufficient to deny a full evidentiary hearing and to support dismissal of the §2255 petition in Chang, 250 F.3d at 85.  In particular, we do not know what, if anything, was communicated to appellant regarding the likelihood of a substantially more severe sentence as a result of going to trial, what original counsel believed as to the plea offer, or why original counsel did whatever he did.  *There is, moreover, the fact the court soon after disqualified original counsel for a conflict of interest.*

Raysor v. United States, Docket No. 09-3871,  at 12 (2d Cir. 2011) (emphasis added)

At oral argument, the Second Circuit panel raised, at the very outset, the issue of conflict of counsel as an issue that needed clarification.

> THE COURT: There's something that neither of you [defense counsel and prosecutor] mention in relation to this in the brief, and I don't know whether it's relevant.  Counsel was ultimately disqualified.  T 6.

Oral Argument Transcript at 5.[6]  The Court opined that "the question of whether a hearing in a context in which counsel was ultimately disqualified is a particularly appropriate one."   Oral Argument Transcript at 6.  The Court further queried whether "the counsel was conflicted at the time the government's plea offer was made."  Appellate counsel did not have a decisive answer to the court's query.  However, she noted that in the government's motion to disqualify counsel, there was a footnote indicating that the government had not sought to remove counsel earlier because counsel continually represented that there would be a plea entered in this case, and therefore the conflict wouldn't be a problem."  Oral Argument Transcript at 6.  See also United States v. Raysor, 96 Cr 339 (EHN), Docket Entry No. 69, (Government's Motion to Disqualify Counsel at 9).[7]

The facts regarding Hurwitz' conflict of interest are undisputed and existed throughout the entire period that Hurwitz represented Petitioner.  These facts are meticulously set forth in the government's Memorandum of Law in Support of its Motion to Disqualify Hurwitz.  In the Preliminary Statement, the government asserts that there is an "actual conflict of interest which cannot be waived or remedied other than by an order of disqualification."   Gov't's Disqualification MOL at 2.  Two of the "serious" conflicts had evolved into actual conflicts after the plea offer expired because the government asserted that, at trial, Hurwitz would be an unsworn witness to a series of events surrounding alleged plots by his former client and his present client, co-defendants Umeme Raysor and Ronald Stanley, to murder witnesses and obstruct justice so that

---

[6]        A copy of this transcript is attached hereto as Exhibit A.

[7]        Because the text of the government's Memorandum of Law In Support of its Motion to Disqualify Counsel is not accessible by ECF, a copy of it is attached hereto as Exhibit B.

the state would dismiss a 1993 homicide case against Ronald Stanley.  Not only did Hurwitz represent Ronald Stanley in the 1993 state court murder case which was eventually dismissed because the People's primary witness refused to testify for fear of reprisals, but Hurwitz also represented co-defendant Shawn Davis in a prior federal criminal case in the Eastern District of New York.  Davis was now a co-defendant in the instant case as well and also a co-defendant together with Stanley and Petitioner in the conspiracy to murder and the murder of witnesses relating to Stanley's state court murder charge. .  Adding fuel to the conflict issue is the fact that Davis had entered into a cooperation agreement with the government while the global plea offers were still pending, thereby agreeing to testify against his co-defendants if the case were to proceed to trial,

The government was on actual notice of Hurwitz' representation of Ronald Stanley from at least the time of the production of discovery in the underlying criminal matter.  Ms. Giordano testified that state court records regarding the murders which were recharged federally were provided to the defendants in discovery. T at 50.  The state courts for the murder with which Stanley was charged reflect that Hurwitz was the attorney of record.

Ms Giordano also testified that she became aware of Hurwitz' prior representation of co-defendant Shawn Davis in the course of proffer sessions with Mr. Davis.  These proffer sessions were the precursor to Mr. Davis being offered a cooperation agreement with the government which was signed on January 16, 1997 - a date within the extension of time made on the global plea offers.

Both Petitioner and Pampata Raysor testified that they were not informed at any time during Hurwitz' representation of Petitioner (not when the retainer agreement was signed, nor

16

during the course of the representation) that Hurwitz had a conflict of interest with respect to his representation of Petitioner.  Similarly although the government was aware of the conflict, it did nothing to bring the conflict to the attention of the court so that a <u>Curcio</u> hearing could be conducted.  As noted in footnote 1 of the Government's Disqualification Memorandum:

> The government has continually informed Mr. Hurwitz of the conflicts presented in this case should the case proceed to trial. Based on Mr. Hurwitz's continued representations that his client and the government could reach an agreement with respect to a plea, the government as a courtesy to retained counsel delayed in making this disqualification motion since a Curcio waiver would be sufficient in the context of a plea in this case.

Gov't's Disqualification Memo at 9, fn. 1.

The law on <u>Curcio</u> issues is well-settled and clear.  The Sixth Amendment of the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."  This guarantee includes a qualified right to choose one's counsel.  Since the right to choose one's counsel is not absolute, it may be outweighed by a "clear demonstration of actual conflict" or at the very least, by a clear demonstration of a serious potential for conflict."  <u>See</u> <u>United States v. Gotti</u>, 771 F. Supp. 552, 564 (E.D.N.Y. 1991) (<u>quoting</u> <u>United States v. Wheat</u>, 486 U.S. 153, 164 (1988)).

Moreover, an inquiry must be held when the district court is informed of "even the possibility of a conflict of interest" to determine whether the attorney suffers from an actual conflict, a potential conflict or no conflict at all.  <u>United States v. Levy</u>, 25 F.3d 146, 153 (2d Cir. 1994).  If the inquiry reveals that a criminal defendant's attorney suffers from "a severe conflict . . .  the court is obliged to disqualify the attorney."  <u>Id</u>.  If the court finds a lesser or potential conflict, the court should follow the procedures set out in <u>Curcio</u>.  <u>Id</u>.

In the instant case, notwithstanding that the parties knew that a serious conflict, if not an actual conflict, existed, the court was not immediately informed of the conflict, but rather, the parties waited to inform the court until after plea offer had expired.  Even though Petitioner may have been aware that Hurwitz had previously represented co-defendant Ronald Stanley, Petitioner is not an attorney and cannot be presumed to know that he is entitled to conflict-free representation, or, at the very least, to make a knowing and intelligent waiver of the conflict after having been advised or the potential consequences of being represented by an attorney who has a duty of loyalty to two of his co-defendants. Petitioner's Sixth Amendment rights and his rights under prevailing law right to conflict-free counsel were trumped here by the government's "courtesy" to a retained counsel.  Since Hurwitz has no specific memory of any of the facts underscoring his conduct in this case, it is impossible to gauge how this conflict impacted the legal advice he provided or neglected to provide to Petitioner during the period of plea negotiations.

**I**

## V.    <u>CONCLUSION</u>

For all the reasons set forth herein, in the transcript of the evidentiary hearing and in the previous submissions relating to this case, it is submitted that Petitioner's Sixth Amendment right to effective assistance of counsel was violated by the performance of Petitioner's original counsel which fell below an objective standard or reasonableness and by original counsel's undisclosed serious, if not actual, conflict of interest during the entire period of  plea negotiations.

Dated: New York, New York
          January 16, 2013.

                                        Respectfully submitted,

                                        /s/

                                        JOYCE C.  LONDON, Esq.
                                        JOYCE C. LONDON, P.C.
                                        20 Vesey Street, Suite 400
                                        New York, New York 10007
                                        (212) 964-3700

                                        *ATTORNEY FOR PETITIONER*
                                        *UMEME RAYSOR*