UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

UMEME RAYSOR,

        Petitioner

  v.                                                     03 Cv 5418 (SLT) (JMA)

UNITED STATES,

        Respondent
------------------------------------------------------------------X


## POST-HEARING REPLY MEMORANDUM ON BEHALF OF
## PETITIONER UMEME RAYSOR


JOYCE C. LONDON, P.C.
20 Vesey Street, Suite 400
New York, New York 10007
(212) 964-3700

*ATTORNEY FOR PETITIONER*
*UMEME RAYSOR*

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

UMEME RAYSOR,

       Petitioner

  v.                                                                                                            03 Cv 5418 (SLT) (JMA)

UNITED STATES,

       Respondent
------------------------------------------------------------------X

**POST-HEARING REPLY MEMORANDUM ON**
**BEHALF OF PETITIONER UMEME RAYSOR**

     This Post-Hearing Reply Memorandum of Law is respectfully submitted on behalf of Petitioner/Defendant Umeme Raysor.

**I.**     <u>**Counsels' Advice Regarding the Plea Offer was not Constitutionally Adequate**</u>

     Defense counsel Hurwitz' handling of the plea offer to Petitioner Raysor was not constitutionally adequate.  Raysor testified that he first learned of the plea offer through his co-defendants who were housed with him at FCI Otisville and then by telephone through his attorney.  T. 74.  During the pendency of the plea offer, he did not receive a copy of the government's letter, but rather received from his attorney a note listing the name of each co-defendant and the number of years constituting the offer for that co-defendant.  Moreover, Hurwitz never attended the co-defendant/counsel meetings specifically convened to discuss the global offer.  T.  80.

     Hurwitz testified that he told Raysor that "he was facing life in jail on one side.  The other side, it was a high offer, someplace in the mid-20's or higher.  So if he pled guilty, he knew that he would be going to jail for a very long time.  If he went to trial, he knew he would face the

2

possibility of a life sentence." T 8. Raysor, only about 24 years old at the time, was charged with very serious offense in multiple counts including seven murders and narcotics trafficking in aid of racketeering and he was also charged with narcotics trafficking under the King Pin statute. These are all offenses subjecting him to a mandatory life sentence if convicted.. Simply telling Raysor, an uneducated young man from Brooklyn projects with no knowledge of the harsh federal sentencing laws and, in particular, the then mandatory sentencing guidelines, that he faced the possibility of a life sentence was grossly inadequate. Hurwitz should have gone through the indictment with Raysor count by count and racketeering act by racketeering act  detailing elements the government would have to prove on each charge and the consequences of a guilty verdict on each and every count and racketeering act. Only by doing that, could Hurwitz have ensured that Raysor comprehended the alarming consequences of a conviction on any single count of the indictment  - namely multiple mandatory life sentences where the court would have no discretion to impose a lower sentence. Given the number of charges and Raysor's ignorance of federal law, this would be a lengthy and time-consuming exercise, incapable of being accomplished in very brief weekly phone calls of less than five minutes. Moreover, merely telling Raysor that "he would face the possibility of a life sentence" if he were convicted at trial is not sufficient to meet the Second Circuit's requirement that "counsel must communicate to the defendant the alternative sentence to which he will most likely be exposed." Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000).

     Additionally, Hurwitz' total lack of any specific recollection with respect to this case stands in stark contrast to the recollection of former Assistant United States Attorney Margaret Giordano, petitioner Umeme Raysor and Petitioner's witness Pampata Raysor. Since most of the

conversations between Petitioner and his defense counsel occurred during very brief phone calls (less than five minutes), defense counsel's lack of memory is not surprising. Had he spent the necessary time to ensure that Raysor fully understood the benefits of the plea and the very real dangers of going to trial on this multi-count indictment, his memory would undoubtedly have been better.

     Moreover, there was no testimony from Hurwitz suggesting that he recommended that Raysor accept the plea. Similarly, there was no suggestion from Hurwitz that he recommend that his client proceed to trial. Yet, this was the advice that Petitioner was clearly seeking and which was lacking throughout the pendency of the plea offer. Although the Second Circuit noted in Purdy that counsel may forgo explicitly telling the defendant whether he should accept the government's plea, the facts of Purdy are notably different from the facts herein. In Purdy, the defendant, a military parts supplier, was charged with paying kickbacks to federal contractors to obtain supply contracts. Defense counsel informed the defendant of the probable guideline range which would ensue if he were to plead guilty but with the possibility, but not the certainty of getting a more lenient sentence. Not only did defense counsel inform Purdy verbally of the potential sentence he faced pursuant to a plea and the potential sentence he faced if he were convicted at trial, he also informed Purdy of the same sentencing consequences in writing. Additionally, defense counsel and his associates grilled Purdy in a mock cross examination that was designed to highlight the strengths of the government's case. As a further measure, defense counsel stressed the difficulty of the case from Purdy's perspective and again raised the option of pleading guilty. Throughout this intensive counsel/client contact, Purdy did not waiver in his insistence on his innocence and his desire to go to trial. Subsequent to these meetings, defense

counsel wrote Purdy again outlining his sentence exposure following a plea and following a trial and reiterating to his client the "troublesome" aspects of the case. This letter was followed by a yet another similar letter a month later. Defense counsel then testified at a post-conviction hearing that he took care not to pressure Purdy to admit guilt since Purdy continued to steadfastly maintain his innocence. In light of this extensive record, the Second Circuit found that defense counsel had adequately counseled his client with respect to the guilty plea offer. See Purdy v. United States, 337 F.3d 253 (2d Cir. 2003).

In the instant matter, Hurwitz' advice to Raysor fell far short of the efforts made by Purdy's counsel and in the instant matter, Raysor was not proclaiming his innocence. Rather, Raysor believed that the sentence to be agreed upon in the plea offer was too lengthy and he wanted his attorney to seek a lower sentence.

Although Hurwitz testified about his general procedure regarding informing a client of a plea offer, this general practice stops short of recommending whether the client accept the plea or not. Yet Petitioner was seeking this specific advice and guidance from his counsel. Where counsel does not offer adequate advice regarding the procedural and substantive consequences of rejecting or accepting a plea agreement, counsel's performance is objectively unreasonable. Padilla v. Kentucky, 130 S.Ct. 1473 at 1483.

## II.     Raysor Has Demonstrated A Reasonable Probability That He Would Have Pled Guilty Had He Received Proper Advice

### A.     The Government Demonstrated Its Willingness To Make Exceptions To The Global Offer

The government contends that even if Raysor had chosen to accept the plea offer while it was open, he could not have pled guilty even if he had wanted to as the plea offer was a global

offer. Gov't Post-Hearing Brief at 23. Notwithstanding that it was asserted to be a global offer, the government had already made one exception to the offer before it expired and then made a second exception to the offer after the expiration date. Certainly, there are legions of cases in this courthouse where the government has offered a global plea to defendants which is not accepted by all defendants, but has then worked out individual plea offers outside of the global context for defendants wishing to plead guilty. In light of the fact that the government was prepared to make exceptions to their plea offer, the fact that the offer was global is not in and of itself a sufficient basis to assert that no plea was available to Raysor even if he wished to plead guilty

      B.      **Raysor Has Clearly Acknowledged That He Would Have Pled Guilty Had He Been Properly Advised**

Raysor stated in his affidavit in support of his 2255 Petition that he would have pled guilty had he received proper advice. Hearing Exhibit 5, ¶ 3. Subsequently, when he testified at the hearing on December 6, 2012, he again asserted that if he had been properly informed about the consequences of convictions on any of the counts in the indictment, he would have accepted a plea offer. T at 83.

Although the Government claims that Raysor equivocated on cross examination regarding his willingness to plead guilty, the government is relying on Raysor's confusion as to what he would be pleading guilty to. Since Raysor did not have a copy of the government's global offer letter and had only been given a list with the name of each co-defendant still in the case and the length of the sentence being offered under the global plea, he only knew that he had to plead guilty to a murder. Raysor believed that if he were to accept the plea offer of 29 years, his attorney would be able to negotiate with the government regarding which murder in aid of racketeering he would plead to. T. 107. The government on cross-examination of Raysor,

however, took the position that the murder count referenced in parentheses in the global plea letter, see Hearing Exhibit 2, was beyond negotiation, a fact not established at the hearing. Hence Raysor's confusion and equivocation in his response to the government's hypothetical question. On the other hand, his willingness to plead guilty to a murder in aid of racketeering with a 29 year sentence had he been properly advised is unequivocal.

### III.     Hurwitz Had An Actual Conflict of Interest That Was Unwaivable

The Sixth Amendment to the United States Constitution provides that "in all criminal cases, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." Wheat v. United States, 486 U.S. 153, 159 (1988). The right established by that Amendment entails a "correlative right to representation that is free from conflicts of interest." Woods v. Georgia, 450 U.S. 261, 271 (1981); Amiel v. United States, 209 F.3d 195 (2d Cir. 2000). A defendant is denied this right when he is prejudiced by either a potential or actual conflict of interest. Ciak v. United States, 59 F.3d 296 (2d Cir. 1995). Additionally, not only is this right embedded in the constitution and refined by case law, but it is also highlighted to the bar in the rules controlling the ethical obligations of lawyers. The rules advise the bar that it is a conflict of interest for a lawyer "to represent a client if the representation of that client may be materially limited by the lawyer's responsibility to . . . a third person. Modern Rules of Professional Conduct, Rule 1.7(b).

The purpose of the Code of Conduct and legal precedent is to notify the bar to avoid such conflicts in the first instance. Therefore, the appropriate course of conduct is for counsel (including government counsel) to bring any potential or actual conflict to the attention of the court before any harm has been done or at least on first notice of the problem.

Three defendants charged in the instant indictment were or had previously been represented by Hurwitz[1]:

- Raysor in the instant matter;

- Co-defendant Ronald Stanley in an earlier state court murder prosecution which murder was now recharged as a racketeering act in Count One and wherein both Raysor, Stanley and others were named as co-defendants; and

- Co-defendant Shawn Davis, now a cooperating witness was represented by Hurwitz in a previous Eastern District of New York prosecution.  Notably Shawn Davis' testimony at     trial would detail his involvement with Raysor and Stanley in the same murder.

According to the government's disqualification motion, Hurwitz had an actual conflict of interest that was unwaivable. Specifically, Hurwitz had been retained by the Raysor brothers to represent Ronald Stanley in the state murder trial and had been paid with cash drug proceeds of the narcotics organization.  Additionally, co-conspirators had taken photos of women in the neighborhood to identify the witness against Ronald Stanley at the state trial and these photographs were to be given to Hurwitz (Stanley's lawyer).  The witness providing this information was unsure, however, if Hurwitz ever viewed any photographs or provided them to Ronald Stanley.  As detailed in the government's disqualification motion, the potential witnesses were then murdered.  As a further grounds for disqualification, the government cited the fact that Hurwitz had interviewed potential alibi witnesses for Stanley at his state trial.  These alibi witnesses had agreed to testify falsely on behalf of Stanley.  The government does not allege, however, that Hurwitz was aware that the alibi witnesses were willing to commit perjury and

---

[1] The facts concerning Hurwitz' actual conflict of interest and his potential conflicts of interest are set forth in the Government's February 27, 1997 motion to disqualify Hurwitz, See United States v. Raysor, 96 Cr 339 (EHN), Docket Entry No. 69.

apparently Hurwitz determined that at least one of the witnesses would not be helpful based on information he gleaned at the interview of the witness. Hurwitz' actual conflict of interest existed *ab initio* in the federal case and remained an actual conflict during the pendency of the plea negotiation period.

     As the government has cited in its post-hearing memorandum of law, the Second Circuit has found per se conflicts, requiring automatic reversal where ". . . trial counsel is implicated in the same or close related criminal conduct for which the defendant is on trial." United States v. Williams, 372 F. 3d 96, 103 (2d Cir. 2004). Here the government had evidence that, at the very least, Hurwitz and his law firm had engaged in money laundering directly relating to the criminal charges in the instant indictment. They obtained this information from cooperating witness Shawn David before the global plea had expired.[2]

     Hurwitz and the government both had a patent legal and ethical duty to advise Raysor and the court of the conflict in representation. They ignored this duty. The fact that Raysor may have been aware that Hurwitz previously represented co-defendant Ronald Stanley does not suffice. Raysor, a young uneducated man, cannot be presumed to understand that multiple representation of defendants creates a conflict or potential conflict and the ramifications of that conflict. To place this burden on the shoulders of Raysor is to avoid acceptance of responsibility for inexcusable conduct. Moreover, not only did Hurwitz have an affirmative duty to advise Raysor of the conflict, but the government also cannot remain silent in the face of Hurwitz' multiple representation of co-defendants. See, e.g. Ciak, supra at 306 fn. 8. The Second Circuit has addressed this issue repeatedly in the past and has warned the government about the need to bring

---

     [2]     Davis pled guilty pursuant to a cooperation agreement in mid-January 1997.

such conflicts to the court's attention.  "[C]onvictions are placed in jeopardy and scarce judicial resources are wasted when possible conflicts are not addressed as early as possible.  We therefore reiterate our admonition to the government in earlier cases to bring potential conflicts to the attention of trial judges."  United States v. Stantini, 85 F.3d 9, 13 (2d Cir. 1996) (citing three prior decisions of the court addressing the same issue).  Here, both the government and Hurwitz, a retained attorney, ignored the Second Circuit admonition and the Rules of Professional Conduct and delayed bringing the actual conflict to the Court's attention until after the plea offer had expired.

Accordingly, Raysor's conviction should be reversed based upon defense counsel's actual conflict of interest.

## IV.    CONCLUSION

For all the reasons set forth herein, in the transcript of the evidentiary hearing and in the previous submissions relating to this case, Raysor's Sixth Amendment right to effective assistance of counsel was violated by the performance of Raysor's original counsel which fell below an objective standard or reasonableness and by both the government's and original counsel's deliberate failure to advise the Court of defense counsel's actual conflict of interest which existed during the critical phase of plea negotiations.

Dated: New York, New York
       March 7, 2013.

                                        Respectfully submitted,

                                        /s/

                                        JOYCE C.  LONDON, Esq.
                                        JOYCE C. LONDON, P.C.
                                        20 Vesey Street, Suite 400
                                        New York, New York 10007

                                          (212) 964-3700

*ATTORNEY FOR PETITIONER*
*UMEME RAYSOR*