UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UMEME RAYSOR,

                     Petitioner,[1]

        -against-

UNITED STATES OF AMERICA,

                     Respondent.
-------------------------------------------------------x

**MEMORANDUM AND ORDER**

03-CV-5418 (SLT) (JMA)

**TOWNES, United States District Judge:**

After exhausting the direct appeal of his conviction for racketeering, racketeering conspiracy, and other offenses in *United States v. Raysor*, No. 96-CV-339, petitioner Umeme Raysor moved to vacate his conviction pursuant to 28 U.S.C. § 2255, arguing that his former attorney, Michael Hurwitz, provided ineffective assistance of counsel because he failed to provide adequate advice regarding whether petitioner should accept or reject the government's plea offer. This Court initially denied petitioner's motion without an evidentiary hearing, finding that petitioner failed to establish that he was actually prejudiced by counsel's alleged ineffectiveness. Upon appeal, the Second Circuit held that this Court had abused its discretion by not holding a hearing and remanded the case to this Court. *See Raysor v. United States*, 647 F.3d 491 (2d Cir. 2011).

This Court subsequently referred this matter to Magistrate Judge Azrack with directions that she conduct an evidentiary hearing and issue a report and recommendation. On April 5, 2013, Judge Azrack issued her report and recommendation (the "R&R"), recommending that petitioner's § 2255 motion be denied. On April 22, 2014, petitioner filed objections to the R&R.

---

[1] Although it might be more appropriate to refer to Mr. Raysor, who moves to set aside his conviction pursuant to 28 U.S.C. § 2255, as "movant," Mr. Raysor has been referred to as "petitioner" throughout this action. To avoid confusion, this Court will adopt that nomenclature and refer to Mr. Raysor as "petitioner."

This Court has conducted a de novo review of those portions of the R&R to which petitioner objects. For the reasons set forth below, this Court finds that petitioner's objections are without merit and adopts the R&R in its entirety.

## BACKGROUND

### Procedural History

The following history is drawn from the prior reported decisions in this action and from documents contained in the Court's file in this case and in the underlying criminal case. From approximately 1985 to 1996, petitioner and his brother, Chaka Raysor, ran a violent street gang that distributed large quantities of drugs in New York and Virginia. After his arrest, petitioner, his brother, and other members of the gang were indicted in this district in *United States v. Raysor*, No. 96-CR-339, a case which was originally assigned to the late Judge Nickerson. That indictment was twice superceded, ultimately by a superceding indictment (S-2) which named petitioner; his brother, Chaka; their cousin, Ronald Stanley; and seven other individuals— Derrick Henderson, Michael Jones, Michael Sidbury, Cecil James Cross, Gus Robinson, Shawn Davis and Cleveland Whorley—as defendants.

That superceding indictment contained 20 counts.[2] Petitioner was named in 13 of them— namely, the first eight counts and Counts 15, 18, 19, 20, and 22. The first count, which charged petitioner and others with racketeering in violation of 18 U.S.C. § 1962(c), alleged ten racketeering acts, seven of which charged petitioner with conspiring to commit, attempting to

---

[2]Although the counts are numbered 1 through 22, the superceding indictment does not contain a Count 17 or a Count 21.

commit, committing, and/or acting with others to commit one or more murders.[3] The second

count charged petitioner and others with a racketeering conspiracy in violation of 18 U.S.C.

§ 1962(d). Counts 3, 4 and 5 charged petitioner and others with conspiring to murder a witness

who was expected to testify against Stanley, murdering one Jemela Brown in the mistaken belief

that she was the witness, and using a firearm in connection with that murder. Counts 6 and 7

charged petitioner and others with murdering one Kimmana Reaux in the mistaken belief that she

was a witness against Stanley and murdering one Christopher Ryant, who was with Reaux when

she was murdered. Count 8 charged petitioner and others with carrying and using a firearm in

connection with the crimes charges in Counts 3, 6 and 7.

Count 15 charged petitioner and others with assault in aid of racketeering in connection

with a June 1995 assault on one Gregory Tucker. Count 18 charged petitioner and others with

engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. The nineteenth

count charged petitioner and others with conspiring to distribute and to possess with intent to

distribute cocaine base over an 11-year period. Count 20 charged petitioner and his brother with

distributing and possessing with intent to distribute cocaine base on March 27, 1996, while

Count 22 charged petitioner alone with distributing and possessing with intent to distribute

cocaine base on April 16, 1996.

In November 1996, the government made oral plea offers to petitioner and some of his

co-defendants. On December 10, 1996, after several attorneys called with questions regarding

the offers, AUSA Margaret Giordano wrote a two-paragraph letter addressed to eight attorneys

including Hurwitz, who represented petitioner. The first paragraph of that letter consisted of a

---

[3]Although the racketeering acts are numbered one through eleven, the indictment does not
contain a Racketeering Act Eight.

single sentence which advised the attorneys that the plea offers would expire on December 20, 1996. The second paragraph contained a brief description of the plea offers being made to six of the ten defendants named in the Superceding Indictment. The only two sentences relating to petitioner read as follows:

> The plea offers are global with respect to all defendants except for the defendants Gus Robinson and Cleveland Whorley. The plea offers to Umeme Raysor and Ronald Stanley are Rule 11(e)(1)(C) pleas to Racketeering Acts One (Murder) and Eleven (Narcotics Conspiracy) and Count Five (Firearm Use) of the Superceding Indictment resulting in an agreed upon 29 years.

Letter from AUSA Margaret M. Giordano to Michael Hurwitz, Esq., *et al.*, dated Dec. 10, 1996, at 1-2.

On January 16, 1997, the government entered into a cooperation agreement with Shawn Davis, one of the six defendants to whom the global offer had been made. Although the deadline for accepting the plea offer was extended until sometime after a February 3, 1997, meeting between AUSA Giordano and defense counsel, none of the remaining defendants accepted the plea offer prior to the deadline.

### The Motion to Disqualify Hurwitz

Shortly after the deadline expired, the government moved to disqualify Hurwitz. In its Motion to Disqualify Counsel for Umeme Raysor dated February 27, 1997 (the "Disqualification Motion"), the government alleged that Hurwitz had two "potential" conflicts of interest and one "actual" conflict. The government did not allege that Hurwitz had a "*per se*" conflict of interest.

Because the alleged conflicts of interest are central to petitioner's claims that his Sixth Amendment rights were violated, the Court will describe them in some detail. The "potential" conflicts dealt with Hurwitz's prior representation, on separate occasions, of Ronald Stanley and

Shawn Davis. According to the government, petitioner and his brother, Chaka, had retained Hurwitz to defend Stanley against a New York State indictment charging him with the murder of one Sammy Haidir. Disqualification Motion, p. 4. Aware that Stanley had been identified by a female witness, petitioner, his brother, and Stanley "essentially orchestrated a hunt" for that witness, which involved taking photographs of women who lived in the vicinity of the murder. *Id.*, p. 5. Kimmana Reaux was wrongly identified as a possible witness, but Shawn Davis—whom Hurwitz had previously represented in a federal case involving theft of mail from postal relay boxes—provided the wrong address to the gang member who was dispatched to murder Reaux. *Id.*, pp. 5-6. As a result, Jemela Brown—Reaux's downstairs neighbor—was mistakenly killed. *Id.*, p. 6. About two weeks later, Reaux was also murdered, along with her boyfriend, Christopher Ryant. *Id.*

Although the government claimed to have a witness who could testify that the women's photographs were to be given to Hurwitz, that witness could not testify that Hurwitz ever viewed the photographs or provided them to Stanley. *Id.*, p. 7. Moreover, the government allegedly had a witness who could testify that petitioner and his brother were using "cash drug proceeds" to pay Hurwitz to represent Stanley. *Id.* However, the Disqualification Motion did not allege that Hurwitz was aware of the source of the money he was receiving.

In seeking to disqualify Hurwitz, the government raised three arguments. First, the government alleged that Hurwitz had an "actual" conflict because he was a witness to, among other things, (1) meetings in which Davis, Chaka Raysor, and others attempted to obstruct justice by presenting Hurwitz with witnesses who were prepared to perjure themselves in order to exculpate Stanley and (2) his receipt of cash payments from petitioner and his brother. *Id.*, pp. 12-13. The government did not allege that Hurwitz knew of the scheme to obstruct justice, that

the proffered testimony was perjured, or that he may have been involved in money laundering. Second, the government asserted that Hurwitz might have conflicting obligations to petitioner and his co-defendant, Stanley, if they had competing defenses regarding the murders of Brown, Reaux, and Ryant. *Id.*, p. 14. Third, the government argued that Hurwitz might have a conflict of interest if he had to cross-examine his former client, Davis, who was expected to testify against petitioner. *Id.*, p. 15.

Judge Nickerson gave petitioner until March 14, 1997, in which to respond to the Disqualification Motion. *See* Calendar Entry dated Feb. 28, 1997. In an undocketed letter dated March 11, 1997, Hurwitz advised the judge that petitioner did not oppose the government's motion and requested permission to withdraw from the action. That request was granted, as evidenced by a calendar entry for a status conference on April 4, 1997, which reflects that petitioner requested "additional time to retain new counsel."

### The Trial, Verdict, and Appeal

Almost two years later, on January 9, 1998, the government entered into a plea agreement with Michael Jones, one of the five remaining defendants to whom the plea offer had been made. The other four defendants—petitioner, Stanley, Cross and Sidbury—proceeded to trial in mid-February 1998. The trial lasted twelve weeks and involved more than 50 witnesses.

On April 27, 1998, the jury returned its verdict. Plaintiff was found guilty of Counts One, Two, Eighteen and Nineteen: racketeering (18 U.S.C. § 1962(c)); racketeering conspiracy (18 U.S.C. § 1962(d)); operating a continuing criminal enterprise (21 U.S.C. § 848); and conspiracy to distribute and to possess with intent to distribute cocaine base (21 U.S.C. § 846). He was acquitted of the other nine counts with which he had been charged. The jury also found that the government had failed to prove all but three of the racketeering acts charged. However, one of

the three racketeering acts was a murder. On August 13, 1999, petitioner was sentenced to four concurrent terms of life imprisonment.

Petitioner appealed his conviction. In April 2002, the Second Circuit vacated petitioner's conviction for conspiring to distribute and to possess with intent to distribute cocaine base in violation of 21 U.S.C. § 846, but affirmed petitioner's conviction on the other three counts. *United States v. Raysor*, Nos. 99-1503(L), 99-1504(CON), 2001 WL 36037731 (2d Cir. Apr. 29, 2002) (summary order). Petitioner sought a writ of certiorari in the United States Supreme Court, but certiorari was denied on November 4, 2002. *Raysor v. United States*, 537 U.S. 1012 (2002).

### The Instant Action

In October 2003, petitioner, proceeding *pro se*, commenced this action by filing a motion to vacate, set aside or correct a sentence pursuant to 28 U.S.C. § 2255. In a 20-page memorandum of law submitted in support of that petition, petitioner argued that both his trial counsel and appellate counsel provided ineffective assistance. First, petitioner argued that Hurwitz had "failed to discuss with [him] the advisability of whether to accept or reject the government's plea offer." Petitioner's Memorandum of Law in Support of his Motion ("Petitioner's Memo") at 1. Second, petitioner argued that his appellate counsel failed to advance two arguments relating to his conviction for operating a continuing criminal enterprise. Finally, petitioner argued that both trial counsel and appellate counsel failed to raise certain arguments relating to sentencing.

In support of these arguments, Petitioner provided his own two-page affidavit dated Oct. 13, 2003. In relevant part, that affidavit stated that at some point prior to trial, Hurwitz had informed petitioner that the government "offered a plea bargain of 29 years." Affidavit of

Umeme Raysor dated October 13, 2003, ¶ 3. However, according to the affidavit, Hurwitz never provided petitioner with "his ultimate opinion as to the wisdom of the plea" or "any suggestions as to how to deal with the government's plea offer." *Id.* Petitioner "assert[ed] that if properly advised by counsel, he would have accepted the plea bargain instead of proceeding to trial." *Id.*

Since petitioner's co-defendant, Stanley, filed his own § 2255 motion less than a month after petitioner's motion, the government responded to both motions in a single Consolidated Memorandum in Opposition to the Defendants' Motions ("Government's Opposition"). With respect to petitioner's first argument—that Hurwitz failed to discuss the plea bargain—the government provided a declaration from Hurwitz dated March 11, 2004 (the "Hurwitz Declaration"). That declaration, however, consisted of only two paragraphs. The first merely clarified that Hurwitz was not "trial counsel." The second paragraph, in its entirety, read as follows: "I conveyed the government offer of 29 years to the defendant. The defendant refused the offer."

Although the Hurwitz Declaration was not at all detailed, the Court found it unnecessary to hold an evidentiary hearing. Rather, the Court held that even if Hurwitz's advice to petitioner regarding the plea fell below an objective standard of reasonableness, petitioner had not demonstrated a reasonable probability that he would have accepted the plea if he had been provided with adequate advice. *Raysor v. United States*, Nos. 03-CV-5418 (SLT)(JMA) & 03-CV-5606 (SLT)(JMA), 2009 WL 2707307, at *2 (E.D.N.Y. Aug. 26, 2009). The Court also rejected petitioner's other arguments and denied petitioner's § 2255 motion in its entirety.

Petitioner appealed. The Second Circuit granted a certificate of appealability, but only with respect to the question of "whether the district court erred in not conducting an evidentiary hearing." *Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011). On July 27, 2011, the

Second Circuit answered that question in the affirmative. In short, the Second Circuit ruled that petitioner's sworn assertion that he would have accepted the plea offer if properly advised, plus the significant disparity between the plea offer and the sentence actually imposed, was *prima facie* evidence that, but for counsel's improper advice, petitioner would have accepted the plea offer. Absent a "detailed affidavit" from Hurwitz, there was no evidence regarding the reasonableness of counsel's performance. Accordingly, while acknowledging that the issues in the case were "close," the Second Circuit remanded the case for further proceedings, stating:

> Numerous questions of fact or mixed fact and law must be resolved in appellant's favor if he is to prevail. These include: (i) what would have been reasonable legal advice in the circumstances; (ii) whether original counsel gave such advice; (iii) what the considered basis for original counsel's actions was; and (iv) whether but for counsel's alleged ineffectiveness, appellant would have accepted the government's plea offer and pled guilty. There is sufficient chance of success, however, in our view to justify a full hearing on remand.

*Raysor*, 647 F.3d at 497.

By order dated August 8, 2012, this Court referred the case to Judge Azrack, directing that she conduct an evidentiary hearing on petitioner's ineffective assistance claim and prepare a report and recommendation relating to petitioner's § 2255 motion. In accordance with that order, Judge Azrack conducted a hearing on December 6, 2012. About four months later, after extensive post-hearing briefing which need not be described here, Judge Azrack issued her R&R, recommending that this Court deny petitioner's motion.

### Judge Azrack's R&R

The R&R summarizes the hearing testimony at length. R&R, pp. 7-15. This Court has reviewed the hearing transcript and agrees with Judge Azrack's characterization of the testimony. Since familiarity with the R&R is assumed, there is no need to repeat that summary here.

However, portions of the testimony which are germane to petitioner's objections to the R&R are described in the Discussion section below.

Based on the hearing testimony, Judge Azrack concluded that petitioner had not proved (1) that Mr. Hurwitz's performance was deficient or (2) that petitioner was prejudiced by virtue of the deficient performance. Judge Azrack opined that, in the context of this case, "reasonable legal advice" would entail:

> (1) conveying the government's offer to recommend a twenty-nine year sentence if petitioner pled guilty to Racketeering Acts One (Murder) and Eleven (Narcotics Conspiracy), and Count Five (Firearm Use); (2) advising petitioner of the strengths and weaknesses of the government's evidence-including the video and audio evidence, as well as any additional discovery the government had produced to that point; (3) explaining that discovery was incomplete, meaning Hurwitz could not be certain of all the evidence the government would present at trial; (4) informing petitioner that the government intended to call cooperating witnesses about whom Hurwitz lacked information, and that the jury's assessment of those witnesses' credibility could determine the verdict; (5) explaining, for each charged crime, what sentence petitioner would likely face if convicted at trial; and (6) discussing with petitioner whether accepting or rejecting the government's offer made sense.

R&R, p. 18. Judge Azrack then analyzed each of these six actions and concluded that Mr. Hurwitz had "provided such advice." *Id.* First, she credited Hurwitz's testimony that he had (1) "conveyed the government's plea offer to petitioner and discussed it with him during several conversations[; (2)] ... discussed with petitioner the strength of the government's case, based partly on discovery to that point, including audiotape evidence and a videotape relevant to one of the narcotics counts[; (3)] ... advised petitioner that the government would rely on cooperating witnesses about whom Hurwitz had no information because discovery was incomplete[; and (4)] ... discussed with petitioner the pros and cons of accepting the offer, including that petitioner

10

faced a possible life sentence if he went to trial and a twenty-nine year sentence if he pled guilty." *Id.*, pp. 18-19 (internal quotations and citations omitted; brackets added). In addition, after crediting Hurwitz's testimony regarding his general practices, the judge found that in accordance with those general practices:

> Hurwitz advised petitioner (1) that he could not predict whether the jury would credit the cooperating witnesses' testimony (particularly because he did not know how many cooperating witnesses the government planned to introduce and who those witnesses were); (2) what sentence petitioner could expect to face upon conviction; and (3) whether he believed that petitioner's decision to decline the offer made sense.

*Id.*, p. 20. In addition, Judge Azrack credited "Hurwitz's testimony that there is no chance he simply conveyed the government's offer to petitioner and left petitioner to blindly decide on his own whether to accept" and discredited "petitioner's testimony that he was unaware, at the time of the plea offer, that a conviction on almost any count of the indictment would result in a life sentence." *Id.* (internal citations omitted).

The judge also concluded that petitioner had failed to establish that he was prejudiced by Hurwitz's allegedly deficient performance. First, noting that the written plea offer was global, Judge Azrack held that petitioner had not established that his co-defendants were inclined to accept the offer or that the offer was not truly global. Rather, she noted that three of the five co-defendants to whom the offer was made refused to accept it. While the other two defendants were allowed to plead guilty, Judge Azrack noted that one became a cooperating witness and that the other was permitted to plead shortly before trial after the government ascertained that the evidence against him had "changed in character significantly." *Id.*, p. 22 (quoting Hearing Transcript, pp. 54-55).

Second, Judge Azrack noted that petitioner's own testimony undercut his claim of prejudice. The judge noted that, on cross-examination, petitioner admitted that he was uncertain as to whether he would have pled guilty absent Hurwitz's allegedly deficient representation. In addition, the judge noted that even at the hearing, petitioner continued to deny his guilt, casting doubt on the credibility of his claim that he would have been able to allocute to the racketeering count. *Id.*, p. 23.

Finally, Judge Azrack noted that, although Hurwitz was relieved as counsel after petitioner rejected the plea offer, the issues that caused him to be relieved did not affect his performance with respect to the plea offer. Judge Azrack noted that there was no evidence of a *per se* conflict. Moreover, she opined that while the "actual" and "potential" conflicts identified in the government's February 27, 1997, letter could have prejudiced petitioner had he been represented by Hurwitz at trial, they would not have affected Hurwitz's advice as whether to take a plea. *Id.*, p. 25.

### *Petitioner's Objections*

On April 22, 2013, petitioner filed "Objections to Magistrate Judge Azrack's Report and Recommendation" (the "Objections"), challenging many of Judge Azrack's factual conclusions. The arguments raised in the Objections, which are described in detail in the discussion below, are separated into three sections. First, petitioner argues that Hurwitz failed to provide effective assistance of counsel. Second, petitioner argues that he has demonstrated prejudice arising from Hurwitz's allegedly deficient representation. Third, petitioner argues that his Sixth Amendment rights were violated because "the motion papers imply that a *per se* conflict does underlie Hurwitz's representation of [petitioner]." *Id.*, p. 7.

On June 28, 2013, the government filed its "Response to the Defendant's Objections to the Magistrate Judge's Report and Recommendation" (the "Response"). On August 7, 2013, petitioner filed a "Reply to Government's Response to Petitioner's Objections" (the "Reply"). To the extent they are relevant, the arguments and evidence set forth in the Response and Reply are described in the discussion below.

## DISCUSSION

### I. Standard of Review

In reviewing objections to a report and recommendation issued by a magistrate judge, the district court applies the standard of review set forth in 28 U.S.C. § 636(b)(1) and Rule 72(b)(3) of the Federal Rules of Civil Procedure. Under both provisions, a district court is to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *accord* Fed. R. Civ. P. 72(b)(3). Upon de novo review, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). A district court, however, is not required to review the factual or legal conclusions of the magistrate judge as to those portions of a report and recommendation to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).

### II. Effective Assistance of Counsel

In the first section of his Objections, petitioner argues that Hurwitz failed to provide effective assistance of counsel. Petitioner does not object to that portion of the R&R in which Judge Azrack identified six actions comprising "reasonable legal advice." Rather, relying on portions of the hearing transcript, the government's Disqualification Motion, and some

speculation, petitioner argues that Judge Azrack was incorrect in concluding that Hurwitz had taken those six actions.

### A. The First Action: Conveying the Offer

With respect to the first of the six actions, petitioner argues that Judge Azrack incorrectly found that Hurwitz "conveyed the government's plea offer to petitioner and discussed it with him during several conversations." R&R, p. 18. Petitioner asserts that Hurwitz never properly conveyed the government's plea offer to petitioner because (1) petitioner "learned of the length of the sentence required via telephone" and (2) never received a copy of "the actual plea offer letter." Objections, p. 3. Petitioner alleges that "he asked for a copy of the offer in writing," but that Hurwitz only provided him with a list of the co-defendants and the offers relating to them, rather than a copy of the government's letter. *Id.*

It is well-established that defense counsel must communicate the terms of a plea offer to his or her client. *See, e.g., Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000) (citing *Cullen v. United States*, 194 F.3d 401, 404 (2d Cir. 1999). However, petitioner does not cite to any authority for the proposition that defense counsel is required to communicate the plea offer in person or in a particular way. Indeed, neither the government nor the Court is aware of any such authority. *See* Response, p. 3.

Furthermore, there is no evidence that petitioner asked for a copy of the government's written plea offer or that Hurwitz failed to comply with petitioner's request. By the time of the hearing, petitioner could no longer recall exactly what was said during the conversation in which Hurwitz communicated the plea offer. However, even petitioner did not recall specifically asking for a copy of the government's letter. Rather, he recalled asking "to see [the offer] in writing or something like that." Transcript, p. 75.

14

Although it is clear that Hurwitz sent petitioner a document communicating terms of the offer, it is unclear precisely what he sent. Petitioner testified only that he did not think he ever saw the government's letter. *Id.*, p. 77. Yet, petitioner's description of the document which petitioner recalled receiving—a letter "basically stipulating what the co-defendants were offered" and reflecting that the government was offering petitioner a recommended sentence of twenty-nine years, *id.*, pp. 75-76—describes the essence of the government's letter. Accordingly, even assuming that petitioner did not receive a copy of the government's letter, whatever document Hurwitz sent to petitioner appears to have contained most, if not all, of the information contained in that letter.

### B. The Second, Third and Fourth Actions: Assessing the Government's Case

Petitioner also objects to Judge Azrack's finding that Hurwitz adequately advised petitioner of the strengths and weaknesses of the government's case, explained that discovery was incomplete, and informed petitioner that the government intended to call cooperating witnesses about whom Hurwitz lacked information. Relying on Hurwitz's testimony at the hearing, Judge Azrack found that "Hurwitz advised petitioner that the government would rely on cooperating witnesses about whom Hurwitz had no information," and "discussed with petitioner the pros and cons of accepting the offer." R&R, p. 19 (internal quotations and citations omitted). Petitioner argues that Hurwitz's testimony was inaccurate for three reasons. First, petitioner claims that Hurwitz had represented Stanley in state-court proceedings relating to one of the murders charged in the federal indictment and had received *Rosario* material relating to this crime. Second, petitioner argues that Hurwitz had previously represented Davis, who became a cooperating witness before the expiration of the plea offer, and therefore should have been able to "gauge whether Davis would be a credible witness at trial." Objections, p. 4. Third, petitioner

15

implies that Hurwitz's advice was inadequate because Hurwitz had a "very strained relationship" with petitioner at the time and only visited him twice. Although petitioner admits that, on one of these visits, Hurwitz reviewed three videotapes of undercover drug purchases, petitioner notes that these videotapes related only to "the least significant of the charges Raysor was facing." *Id.*

With respect to the first of the three reasons, the government notes that petitioner is mistaken in arguing that Hurwitz defended Stanley against charges relating to one of the murders alleged in the federal indictment. The government notes that the state-court charges against Stanley related to the murder of Sammy Haidir, while the federal indictment charged petitioner with the murder of other individuals. Response, p. 4. In his Reply, petitioner concedes that the government is correct, but notes that the victims of three of the murders charged in the federal indictment were individuals "who were believed to be on the People's witness list at the state murder trial of Ronald Stanley." Reply, p. 2. Petitioner asserts that the *Rosario* material Hurwitz received in the course of Stanley's state-court case would somehow assist Hurwitz in assessing the strength of the government's claims against petitioner.

Preliminarily, this Court notes that there is no evidence that the murders charged in petitioner's federal indictment were murders of actual witnesses. According to the government's Disqualification Motion, Brown and Reaux were mistakenly believed to be witnesses and Ryant was Reaux's boyfriend. However, even if some of the victims of the murders charged in the federal indictment were, in fact, witnesses against Stanley and even if Hurwitz received *Rosario* material relating to those witnesses, it is unclear how that *Rosario* material would assist Hurwitz in assessing the strength of the case against petitioner. Under *People v. Rosario*, 9 N.Y.2d 286, 173 N.E.2d 881 (N.Y. 1961), the defense is entitled to examine a witness' prior statement which relates to the subject matter of the witness' testimony. Accordingly, any *Rosario* material

provided by the People in connection with Stanley's state-court case would presumably be prior statements relating to Stanley's murder of Sammy Haidir. There is no reason to believe that the *Rosario* material would contain any statements relating to other murders or implicating petitioner in those murders.

With respect to the second of the three reasons, the government concedes that Hurwitz represented Davis on unrelated mail-theft charges, but notes that Davis pled guilty. Response, p. 5. The government argues that Hurwitz did not have an opportunity to assess whether Davis would make a persuasive witness and did not know what testimony Davis was prepared to offer against petitioner. *Id.* In his Reply, petitioner implies that Hurwitz, as an experienced defense counsel, could assess Davis's persuasiveness without seeing him testify and that Hurwitz himself knew that Davis could testify that he provided photographs to Hurwitz.

Preliminarily, this Court notes that there was little evidence adduced at the hearing relating to Hurwitz's representation of Davis. There was no evidence relating to Hurwitz's receipt of photographs from Davis, much less proof that Hurwitz provided the photographs to Stanley or anyone else. However, even assuming that the facts alleged by petitioner were true, Hurwitz's knowledge of Davis and the photographs would not provide him with much information regarding Davis's testimony. To be sure, Hurwitz might be able to gauge whether Davis was articulate, intelligent or persuasive, but could only guess as to how he might perform under pressure at trial. Moreover, Hurwitz did not know the substance of Davis's testimony or what evidence he could provide to incriminate petitioner. Similarly, even if Davis could testify that he provided photographs of suspected witnesses to Hurwitz, there is nothing to suggest that Davis could testify what Hurwitz did with those photographs. Accordingly, knowing that Davis

could testify about giving the photographs to Hurwitz would not, in and of itself, permit Hurwitz to predict that Davis's testimony would be exceptionally damaging to petitioner.

With respect to the third of the three reasons, the facts that Hurwitz (1) rarely visited petitioner, (2) had a strained relationship with him and (3) spent time reviewing with petitioner video evidence relating to the least serious charges do not imply that Hurwitz failed to properly advise petitioner regarding the plea. First, petitioner testified that at the time the plea offer was made, he was incarcerated in Otisville, New York. Hearing Transcript, pp. 74, 76-77. This Court will take judicial notice of the fact that Otisville is approximately 80 miles and a two-hour drive from lower Manhattan, where Hurwitz maintains his office. Moreover, petitioner implied that, because he was in the Solitary Housing Unit at the time the offer was made, he could not have received an in-person visit. Specifically, when asked if he recalled whether he learned of the plea offer "in a meeting with Mr. Hurwitz or on a phone call," petitioner testified, "I was in the SHU at the time, so it was definitely on the telephone." *Id.*, p. 74.

Second, while petitioner testified that he and Hurwitz argued and that, at one juncture, the two men stopped talking to each other, *id.*, pp. 72-73, petitioner also indicated that the two men were on speaking terms by the time the plea offer was made. According to petitioner's own testimony, the two men spoke on the telephone regarding the plea offer. *Id.*, pp. 74-75. Third, the fact that the video evidence related to the least serious charges petitioner faced does not imply a failure to discuss the more serious charges. If anything, that fact supports the government's contention that Hurwitz did not have evidence relating to the more serious charges at the time the plea offer was made.

## C. The Fifth Action: Explaining Possible Sentences

Petitioner also objects to Judge Azrack's finding that Hurwitz adequately explained plaintiff's exposure. In her R&R, Judge Azrack, relying on Hurwitz's testimony, found that Hurwitz "discussed with petitioner the pros and cons of accepting the offer, including that petitioner faced a possible life sentence if he went to trial ...." R&R, p. 19 (internal quotations and citations omitted). Petitioner objects to that finding, arguing that "Hurwitz'[s] testimony that he told Raysor that he faced 'a possible' life sentence if he went to trial is utterly inadequate" because he faced a mandatory life sentence on each of the murders and a mandatory minimum of 20 years (and a maximum of life imprisonment) on the continuing criminal enterprise charge. Objections, pp. 4-5 (brackets added). Petitioner argues that Hurwitz should have told him "that he faced mandatory life sentences on six charges at the very least, in addition to a mandatory minimum sentence of twenty years up to a maximum of life and that the Court had absolutely no discretion to impose a lesser sentence." *Id.*, p. 5.

As the government correctly notes in its Response, Judge Azrack's R&R paraphrased Hurwitz's hearing testimony. Even though Hurwitz did not remember exactly what he told petitioner, he recalled "telling him he was faced with the possibility, *depending on what he was convicted of*, of going to jail for the rest of his life." Hearing Transcript, p. 23 (emphasis added). Although it is unclear whether Hurwitz specified the charges which carried a potential life sentence, that level of specificity would not have been particularly useful in a case in which the defense lacked information regarding the strength of the government's case with respect to particular counts.

Moreover, even assuming that Hurwitz was not more specific, his decision not to emphasize the possibility of a life sentence was entirely defensible. Although the Second Circuit

has stated that counsel, in communicating the terms of a plea offer, "should usually inform the defendant of ... the alternative sentences to which he will most likely be exposed," *Purdy*, 208 F.3d at 45, it has also cautioned counsel against coercing a plea. The Second Circuit has emphasized:

> [A] lawyer must take care not to coerce a client into either accepting or rejecting a plea offer. ... Counsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness because "[r]epresentation is an art," *Strickland*, 466 U.S. at 693, ... and "[t]here are countless ways to provide effective assistance in any given case," *id*. at 689 ....

*Purdy*, 208 F.3d at 45 (internal citations omitted; brackets not within quotes and ellipses added).

In this case, emphasizing the risk of a life sentence could have been coercive. As discussed above, Hurwitz did not have access to the government's evidence and, therefore, could not assess the likelihood that petitioner would be convicted of the continuing criminal enterprise count or that the government could prove his involvement in one of the murders. Petitioner, now knowing that he was in fact convicted of crimes which carried a life sentence, argues that Hurwitz should have struck a different balance. However, in light of the deference to be given to defense counsel's decision as to how best to draw the balance between advice and coercion, it would be inappropriate to use the benefit of hindsight to second-guess Hurwitz's assessment.

### D. The Sixth Action: Discussing Whether to Accept the Plea

Based on Hurwitz's testimony regarding his usual practices, Judge Azrack found that "Hurwitz advised petitioner ... whether he believed that petitioner's decision to decline the offer made sense." R&R at 20. In his Objections, petitioner does not directly challenge this finding. Rather, petitioner argues only that Hurwitz's advice could not have been adequate because (1) he never visited petitioner personally to discuss the plea, (2) had only three- to four-minute

telephone conversations with petitioner about once weekly, and (3) failed to highlight the disparity between the 29-year offer and the life sentence petitioner might receive after trial.

All of these arguments have been addressed previously. First, as noted above at p. 14, *ante*, petitioner does not cite to any authority for the proposition that defense counsel is required to communicate the plea offer in person, and the Court is unaware of any such authority. Second, the fact that the plea discussions may have taken place over the telephone or over the course of several short, weekly conversations does not permit the inference that the discussions were inadequate. Third, as discussed above, emphasizing the risk of a life sentence could have been coercive, and this Court must afford deference to Hurwitz's decision regarding how best to draw the balance between advice and coercion. Accordingly, none of petitioner's arguments persuade this Court that Hurwitz failed to discuss the advisability of entering a guilty plea.

### III. Prejudice

In the second section of his Objections, petitioner argues that Judge Azrack was incorrect in concluding that petitioner failed to demonstrate that he was prejudiced by Hurwitz's allegedly inadequate advice. First, relying solely on the fact that Davis and Jones ultimately pled guilty, petitioner asserts that the plea offer was not truly global. Second, relying solely on petitioner's testimony on direct examination and ignoring all evidence to the contrary, petitioner argues that he was prepared to plead guilty.

#### A. The Global Plea

A "global plea" is one that "must be accepted by all defendants, or it cannot be accepted by any." *Mickens v. United States*, No. 97-CV-2122 (JS), 2005 WL 2038589, at *9 (E.D.N.Y. Aug. 17, 2005). "[W]here the plea offer is global, a defendant asserting prejudice from counsel's deficient representation with respect to the plea offer must either introduce objective facts

indicating that the other co-defendants were inclined to accept the offer, or that the offer was not truly global." *Mickens v. United States*, No. 97-CV-2122 (JS), 2006 WL 2505252, at *1 (E.D.N.Y. Aug. 28, 2006), *aff'd*, 257 Fed. App'x 461 (2d Cir. 2007). The Second Circuit has implied that a plea is not truly global where the government has failed to "enforce the 'global' provision of its offer." *Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003). In *Pham*, for example, the Second Circuit implied that a plea was not "truly global" when the government allowed four defendants to whom a supposedly global offer had been made to plead guilty.

In this case, the government's December 10, 1996, letter expressly stated that the plea offer extended to petitioner and five of his co-defendants was "global." Letter from AUSA Margaret M Giordano to Michael Hurwitz, Esq., *et al.*, dated Dec. 10, 1996, at 1. Moreover, it is undisputed that plaintiff and three of the co-defendants rejected the plea offer. Accordingly, in order to establish prejudice from Hurwitz's allegedly deficient representation with respect to the plea offer, petitioner must introduce objective facts that the offer was not "truly global." *See Mickens v. United States*, 2006 WL 2505252, at *1.

In seeking to establish that the December 10, 1996, plea offer was not "truly global," petitioner asserts only that "exceptions to the global aspect of the plea agreement were made." Objections, p. 6. Petitioner acknowledges that the government has explained why Davis's and Jones's pleas did not violate the global provision, but dismisses the government's explanations as attempts to "rationalize[ ] these exceptions in hindsight." *Id.* Petitioner does not specifically discuss the government's explanations, much less provide any reasons for discounting them.

In contrast, Judge Azrack's R&R contains a careful analysis of these explanations. Judge Azrack points out that neither Davis nor Jones pled guilty pursuant to the plea offer. Davis pled guilty pursuant to a cooperation agreement, which was introduced into evidence at the December

6, 2013, hearing. Jones pled guilty to a stand-alone offer which was made "right before trial," after the government determined that the evidence against Jones had "changed in character significantly." R&R, p. 22 (citing Hearing Transcript, pp. 54-55)).

The fact that Davis and Jones ultimately pled guilty, therefore, does not establish that the government failed to "enforce the 'global' provision" of the plea offer memorialized in its December 10, 1996, letter, and that the plea was not "truly global." *See Pham*, 317 F.3d at 184. There is nothing to suggest that the government would have allowed petitioner alone to plead guilty pursuant to the plea offer. Indeed, as Judge Azrack correctly notes, petitioner himself testified that "the attorney who replaced Hurwitz could not secure a plea offer because 'the prosecutors were not interested in a plea.'" R&R, p. 23 (quoting Hearing Transcript, pp. 82-83)).

### B. Petitioner's Willingness to Plead Guilty

The R&R not only found that the government's plea offer was global, but also found that petitioner had "not established a reasonable probability that he would have pled guilty but for his Hurwitz's alleged ineffective assistance." R&R, p. 23. In arguing that the latter conclusion was incorrect, petitioner relies solely on his repeated assertions "that he would have pled guilty had he received adequate legal advice." Objections, p. 6. He urges the Court to ignore cross-examination testimony in which he admitted that he could not "honestly" say, at age 41, what he would have done at the time of the plea, Hearing Transcript, p. 100, asserting that he was "clearly confused by the government's line of questioning" on cross-examination. Objections, p. 6. Petitioner also asserts that his comments about not belonging to an "organization" or "partnership" were not attempts to deny involvement in racketeering, but reflected his mistaken belief that a racketeering enterprise must have "the formal structure of legitimate business enterprises." *Id.*, pp. 6-7.

Petitioner does not provide, and this Court does not find, any evidence to substantiate petitioner's assertions. First, nothing in the hearing transcript suggests that petitioner denied being a member of an "organization" or "partnership" because he interpreted those terms technically. To the contrary, petitioner went on to deny any "cooperation" between the co-defendants or the existence of any "group" which could be deemed a criminal enterprise. Specifically, when asked if his cousin and co-defendant, Stanley, was "a partner in [petitioner's] organization on the street," petitioner responded:

> I never been in an organization. I did not have a partnership.
> Many of the ... government's cooperators have testimony [*sic*] that
> they were never in an agreement, never in cooperation, never in a
> group. Shawn Davis is one of them, clearly stated that he never
> worked for any of them.

Hearing Transcript, p. 95.

Second, as Judge Azrack correctly noted, petitioner "*repeatedly* admitted at the hearing" that he could not say, and did not know, whether he would have entered a plea in 1997. R&R, p. 23 (emphasis added) (citing Hearing Transcript, pp. 100, 109-110). When initially asked if he would have been willing to allocute to a crime which he denied committing, petitioner candidly stated:

> I cannot sit here and honestly tell you what I would have done
> when I was 24 now when I'm 41. It would not be the same person.
> I would be lying now if I told you what I would have done when I
> was 24 or 25.

Hearing Transcript, p. 100. A few minutes later, the government revisited the issue, asking, "[k]nowing everything that you know now, is your testimony that had you been properly advised by your attorney, you would have accepted the plea offer ...." *Id.*, p. 108. The government, responding to a defense objection, clarified that this question assumed knowledge of the contents

of the December 10, 1996, letter.  Petitioner again testified: "I can't say. ... I can't say what I would do at 24, when I'm 41.  It's like science fiction."  *Id.*, p. 109.

Immediately thereafter, the government essentially repeated this line of questioning.  That led to the following colloquy:

> Q    I am asking—and it's okay if the answer is you don't know—but I'm asking, knowing what you know now, would you then have taken this offer, if you had been given proper advice by your lawyer?
>
> A    Okay, it's like a hypothetical.
>
> Q    It is. It is.
>
> A    So I can't say.  Like you said, I don't know.

*Id.*, p. 110.  In light of the consistency of petitioner's response to this question, which was painstakingly clarified by the government on several occasions, this Court cannot credit petitioner's claims that these damaging admissions were the product of "confusion."  In light of petitioner's repeated and credible testimony on cross-examination that he himself could not now say, and did not know, whether he would have accepted the plea offer in 1997, this Court cannot credit petitioner's pat assurances on direct examination that he would have accepted the plea.

### IV.  Petitioner's Sixth Amendment Rights

Attorney conflicts of interest are grouped into three general categories.   As the Second Circuit explained in *United States v. Williams*, 372 F.3d 96 (2d Cir. 2004):

> The first category describes those conflicts that are so severe that they are deemed *per se* violations of the Sixth Amendment. Such violations are unwaivable and do not require a showing that the defendant was prejudiced by his representation. ... [A]n actual conflict of interest occurs when the interests of a defendant and his attorney diverge with respect to a material factual or legal issue or to a course of action. ... To violate the Sixth Amendment, such conflicts must adversely affect the attorney's performance. ...

> Lastly, a client's representation suffers from a potential conflict of interest if the interests of the defendant may place the attorney under inconsistent duties at some time in the future. ... To violate the Sixth Amendment such conflicts must result in prejudice to the defendant.

*Id.* at 102-03 (internal quotations and citations omitted; brackets and ellipses added).

In this case, Judge Azrack found no evidence to suggest that Hurwitz had a *per se* conflict of interest, which would have automatically precluded Hurwitz from representing petitioner. R&R, p. 25. The magistrate judge noted that the Second Circuit has found *per se* conflicts in only two situations: "where trial counsel is not authorized to practice law, or is implicated in the very crime for which his or her client is on trial." R&R, p. 24 (quoting *Martinez v. Kirkpatrick*, 486 F. App'x. 158, 160 (2d Cir. 2012) (summary order), and *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000) (internal citations omitted)). The second situation presents a *per se* conflict because "when an attorney is implicated in the crimes of his or her client ... , the attorney cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing." *United States v. Fulton*, 5 F.3d 605, 611 (2d Cir. 1993) (internal quotations and citations omitted). Since "the attorney's alleged criminal activity must be sufficiently related to the charged crimes to create a real possibility that the attorney's vigorous defense of his client will be compromised," the fact that an attorney may have committed an unrelated crime does not give rise to a *per se* conflict. *Id.*

In his objection to Judge Azrack's finding that Hurwitz's alleged conflicts did not violate petitioner's Sixth Amendment rights, petitioner argues that "the motion papers imply that a *per se* conflict does underlie Hurwitz'[s] representation of [petitioner]." Objections, p. 7 (brackets added). First, petitioner asserts that the Disqualification Motion alleged that Hurwitz was being paid in cash with the proceeds of narcotics transactions, "potentially involving" the attorney in

26

money laundering. *Id.*, pp. 7-8. Second, petitioner asserts—without any citations—that "during the ... pendency of the plea offer," the government was investigating Hurwitz's potential involvement in the murders charged in the federal indictment. *Id.*, p. 8. Third, petitioner alleges that the murder referenced in the plea offer was the very same murder charged in the state-court case in which Hurwitz had defended Stanley. *Id.*

In its response, the government notes that there is no factual support for petitioner's arguments. First, the government points out that while the government's motion to disqualify Hurwitz alleged that the government intended to prove that petitioner paid Hurwitz using drug proceeds, it did not allege that Hurwitz was aware of the illicit source of the money. Response, p. 9. Second, the government argues that petitioner has no evidence implicating Hurwitz in the efforts to murder a witness to the Haidir murder and no evidence that the government was investigating Hurwitz's alleged involvement in such a conspiracy. *Id.*, p. 10. Third, the government asserts that the murder referenced in the government's plea offer was not the same murder with which Stanley was charged in the State-court case in which Stanley was represented by Hurwitz. *Id.*

In his Reply, petitioner makes no effort to rebut the government's second and third arguments. Rather, petitioner argues only that "the government had actual information implicating Petitioner's attorney in ... the laundering of cash proceeds from the charged narcotics conspiracy." Reply, p. 6. Petitioner does not argue that Hurwitz had knowledge of the source of the money he received, but faults the government for choosing not to act on this information at the time the plea negotiations were ongoing. *Id.*

Assuming, *arguendo*, that the government could prove that Hurwitz was being paid with drug proceeds, this proof would not establish a *per se* conflict of interest. First, petitioner and his

co-defendants were not charged with money laundering, much less money laundering involving their attorneys. Even if there were evidence that Hurwitz was implicated in money laundering, the money laundering would be an unrelated crime, which would not give rise to a *per se* conflict. *See United States v. Fulton*, 5 F.3d at 611. Moreover, there is no evidence that Hurwitz knew the source of the money with which he was paid, or was involved in money laundering. Indeed, as noted in the Response, the government's Disqualification Motion did not allege that Hurwitz was aware of the illicit source of the money. *See* Response, p. 9. Petitioner has not adduced any evidence to suggest that Hurwitz knew the source of the money or believed that he was under investigation for money laundering.

### *CONCLUSION*

This Court has conducted a de novo review of those portions of Judge Azrack's R&R to which petitioner objects and, for the reasons set forth above, concludes that both the Objections and petitioner's motion pursuant to 28 U.S.C. § 2255 are without merit. Accordingly, this Court adopts Judge Azrack's report and recommendation dated April 5, 2013, in its entirety and denies petitioner's motion to vacate his conviction. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

S/
/SANDRA L. TOWNES
United States District Judge

Dated: September 17, 2014
      Brooklyn, New York